IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | CRIMINAL NO. 1:19-CR-315 |
| : | |
| v. : | (Judge Conner) |
| : | |
| **RICHARD TYLER,** : | |
| : | |
| **Defendant** : | |

## MEMORANDUM

Defendant Richard Tyler moves the court to suppress evidence obtained during the search of a residence made pursuant to a warrant. For the following reasons, we will grant Tyler's motion.

**I.    Findings of Fact**[1]

In January 2019, police sought to arrest Tyler on several outstanding warrants for, *inter alia*, aggravated assault and felony firearms and narcotics violations. (See 5/14/21 Tr. 9:12-18). The United States Marshals Service ("Marshals") had conducted surveillance on 611 Mulberry Street in York, Pennsylvania, and observed Tyler and a woman named Jessica Johns entering and exiting the residence, and carrying backpacks between the residence and a black Infiniti vehicle. (See id. at 11:17-12:13, 13:6-14:6). Johns' Pennsylvania driver's

---

[1] The following factual narrative derives from testimonial and documentary evidence adduced during the suppression hearings in this matter, together with exhibits submitted by the parties. Citations to the May 14, 2021 hearing transcript are abbreviated as "5/14/21 Tr. __." The court reporter has provided the court with a rough transcript of the August 24, 2021 hearing. Citations to the August 24, 2021 hearing transcript are abbreviated as "8/24/21 Tr. __." Pagination of the rough draft may vary from pagination of the official transcript. This recitation of facts reflects the court's credibility determinations. To be clear, we find the testimony of the key witness on the issue of consent, Jessica Johns, to be credible.

license listed her address as 611 Mulberry Street.  (See Doc. 38-4 at 2; 5/14/21 Tr. 17:21-18:4).

The Marshals enlisted the help of the York County Drug Task Force ("Task Force") to arrest Tyler due to manpower issues.  (See 5/14/21 Tr. 8:14-25).  Detectives Vincent Monte and Clayton Glatfelter were among those who assisted.  (See id. at 6:8-14, 17:4-16, 61:10-12).  Detective Monte is a member of the Task Force who works primarily on narcotics, firearms, and homicide cases.  (See id. at 4:2-4:12).  Detective Glatfelter is a member of the York County Quick Response Team and his duties include serving "high risk warrants."  (See id. at 60:21-61:3).

On the morning of January 22, 2019, law enforcement officers from the Marshals and Task Force planned entry to the Mulberry Street residence to arrest Tyler.  (See id. at 6:24-7:24).  Johns had just returned home from running errands and was inside the residence when she noticed police outside "surrounding [her] house."  (See 8/24/21 Tr. 15:7-20, 16:9-13).  She heard loud banging on the front door and the police called for her to come out.  (See id. at 16:14-20).  Johns exited the residence out the back door as one of the officers pointed a shotgun at her from roughly 30 feet away.  (See id. at 6:11-7:1, 7:15-8:9).  The firearm remained trained on Johns as she exited and walked through her backyard.  (See id. at 17:12-18:9).  She confirmed Tyler was inside and had been living there intermittently for between one and two months.  (See 5/24/21 Tr. 18:20-19:11, 50:25-51:5).  Detective Monte took Johns across the street, and within roughly five minutes, officers entered, arrested Tyler without incident, and then conducted a protective sweep of the residence.  (See id. at 19:5-9, 19:23-20:16, 21:17-22).  According to Detective

2

Monte, officers observed no "drugs, guns, [or] anything illegal in plain view" during the arrest or the sweep. (See id. at 22:6-24).

Detective Glatfelter assisted in securing the Mulberry Street residence and in locating Tyler. (See id. at 61:10-16). Detective Glatfelter also conducted a walk-around of an Infiniti located down the street from the residence—the same Infiniti Tyler and Johns had been observed in—and detected an odor of marijuana while standing outside the vehicle's passenger side. (See id. at 63:22-64:6). A drug-detection dog sniffed the area surrounding the Infiniti and alerted to the presence of narcotics. (See id. at 68:1-15, 73:16-25).

Detective Monte stayed outside with Johns during Tyler's arrest. (See id. at 46:15-25). After Tyler was arrested, and while at least one officer remained in the house after the protective sweep had concluded, Johns was informed she could reenter her residence. (See 8/24/21 Tr. 20:3-13). Detective Monte followed Johns back inside. (See 5/14/21 Tr. 46:20-47:4). At no time during: (1) Tyler's arrest, (2) the protective sweep, or (3) John's re-entry with Detective Monte, did anyone explicitly ask Johns for consent to enter her residence. (See id. at 57:7-19; 8/24/21 Tr. 10:16-22). Initially, Detective Monte stated, "Based on my conversations that morning with Ms. Johns we had consent to enter the residence." (See 5/14/21 Tr. 27:6-7). But when pressed by the court to clarify, Detective Monte backpedaled:

> The Witness: . . . I don't recall exactly our conversation as far as, you know, getting inside the house . . . it was my belief that we didn't need consent to effect the arrest warrant. Once the arrest warrant was served we were back in the residence. There was no, you know, do I have consent to enter your residence . . .

3

> The Court: Well, no, I think you've answered my question, but what you're saying is you did not ask her for consent at any point in time . . .
>
> The Witness: Correct.

(See id. at 57:12-23, 58:9-16).[2]  Johns also had no recollection of Detective Monte asking for her consent to enter the residence.  (See 8/24/21 Tr. 10:16-23).  She only recalled being informed that she could "go back in" to her house.  (See id. at 20:3-13).  Upon walking into the residence's front living room, Detective Monte smelled a strong odor of marijuana.  (See 5/24/21 Tr. 24:17-21, 29:19-24, 35:5-9).

Based on his perception that marijuana was present inside the residence, Detective Monte read Johns her Miranda rights and instructed "everyone to sit there" while he left to apply for a search warrant.  (See id. at 41:25-42:14; Doc. 38-3 at 8).  Detective Glatfelter was one of the officers who remained with Johns, testifying that Johns was "brought back in" after Tyler was arrested.  (See 5/14/21 Tr. 69:13-25).  He testified that he did not recall Detective Monte asking for Johns' consent to be inside the residence.  (See id. at 71:5-8).

---

[2] The parties do not dispute law enforcement's initial authority to enter the residence.  An arrest warrant based on probable cause "implicitly carries with it the limited authority to enter a dwelling," see Pilchesky v. Barone, 730 F. App'x 126, 128 (3d Cir. 2018) (nonprecedential) (quoting Payton v. New York, 445 U.S. 573, 603 (1980)), if officers possess "probable cause to believe an arrestee resides at and is then present within the residence," see United States v. Vasquez-Algarin, 821 F.3d 467, 480 (3d Cir. 2016).  The government does not argue that Detective Monte could reasonably rely on the authority the officers initially possessed to enter the residence pursuant to Tyler's arrest warrant.  Detective Monte was not a part of the arrest team, and Tyler had already been removed when Detective Monte followed Johns inside.  (See 5/24/21 Tr. 20:14-20:23, 46:20-47:4).

Detective Monte's affidavit of probable cause avers he "detected a strong odor of marijuana inside the front living room" and therefore believed that "illegal narcotics, including marijuana" were located in the residence. (See Doc. 38-4 at 2, 3). It also includes Detective Glatfelter's observation about, and the canine's alert to, the possible presence of narcotics in the Infiniti. (See id. at 2-3). The affidavit contains no indication that Detective Monte asked for or received consent from Johns to enter the residence. (See generally Doc. 38-4). The search warrant sought marijuana and any other drugs or paraphernalia, firearms, and the keys to the Infiniti. (See id. at 1, 4).

Detective Monte returned with a signed search warrant less than two hours later. (See Doc. 38-3 at 8; Doc. 38-4 at 6-7). The search of 611 Mulberry Street yielded, *inter alia*, two clear knotted bags of marijuana, weighing a total of 8.56 grams; a clear knotted bag of 69 pills containing oxycodone, recovered from a men's jacket; a box of clear baggies and two digital scales; a clear knotted bag of crack cocaine, recovered from inside a men's boot; a plastic bag containing 16 separate knotted bags of heroin; and a key fob to the Infiniti. (See Doc. 38-3 at 1-3, 9; Doc. 38-4 at 6; Doc. 38-5 at 1). Officers who searched the Infiniti found a blue iPhone, a Glock pistol with magazine and 17 live rounds, and a marijuana roach. (See Doc. 38-3 at 3).

## II. Procedural History

In October 2019, a federal grand jury returned a three-count indictment charging Tyler with possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute heroin, in violation of 21

5

U.S.C. § 841(a)(1); and possession of a firearm by a person not to possess, in violation of 18 U.S.C. § 922(g)(1). Tyler pled not guilty and moved, through appointed counsel, to suppress the evidence recovered from 611 Mulberry Street.[3] Tyler does not seek to suppress the evidence obtained from the search of the vehicle. (See 8/24/21 Tr. 33:12-17). The motion is fully briefed and ripe for disposition.

### III. Discussion

The Fourth Amendment ensures that people are "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. "When it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 6 (2013). The warrant requirement "minimizes the danger of needless intrusions" into constitutionally protected areas, such as the home. See Payton v. New York, 445 U.S. 573, 586 (1980). Warrantless searches "are per se unreasonable—subject only to a few specifically established and well-delineated exceptions." United States v. Mallory, 765 F.3d 373, 382 (3d Cir. 2014) (citation omitted).

---

[3] Tyler initially premised his motion on a challenge to the truthfulness of factual statements in Detective Monte's affidavit of probable cause and requested a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). (See Doc. 38 ¶¶ 5-7). Following a May 2021 Franks hearing, both parties provided supplemental briefing on the threshold issue of whether Johns voluntarily consented to Detective Monte's initial presence in the Mulberry Street residence. (See Doc. 53 at 13-18; Doc. 54 at 10-16). We resolve the motion on the threshold issue of voluntariness, and thus do not consider the Franks component of the briefing.

A search pursuant to consent is one such exception. See Fernandez v. California, 571 U.S. 292, 298 (2014). Police may enter a home with consent that is "freely and voluntarily given" from a lawful occupant. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). Consent cannot, however, "be coerced, by explicit or implicit means, by implied threat or covert force." Id. at 228. A person's "mere submission to a claim of lawful authority" does not suffice to demonstrate voluntary consent. See United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009) (citing Florida v. Royer, 460 U.S. 491, 497 (1983)). The government bears the burden of proving consent by a preponderance of the evidence. See United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)).

Courts evaluate voluntariness of consent through a totality-of-the-circumstances analysis. Price, 558 F.3d at 278 (citing Schneckloth, 412 U.S. at 227). Factors include information about the individual, such as age, education, intelligence, and whether she has experience with the criminal justice system. Id. We consider whether the individual "was advised of [her] constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." Id. Courts also analyze "the setting in which the consent was obtained, [and] the parties' verbal and non-verbal actions." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) (citation omitted). If a person "invites" law enforcement to conduct a search, this action can indicate voluntary consent. See United States v. Stabile, 633 F.3d 219, 231 (3d Cir. 2011) (cohabitant's consent for officers to search house was voluntary when she "invited" officers inside, offered

7

them drinks, signed consent form, and orally consented); United States v. Claus, 458 F. App'x 184, 189 (3d Cir. 2012) (nonprecedential) (consent voluntarily given when home's occupant sequestered her dogs, spoke with officers, and "invited" them inside the home). No single factor controls the voluntariness analysis. See Schneckloth, 412 U.S. at 226. If consent is not voluntary, then it is "invalid and the search [is] unreasonable." Id. at 233.

The Third Circuit Court of Appeals' decision in Price is illustrative. In Price, the defendant was arrested at his place of employment after evading law enforcement for more than two years. See Price, 558 F.3d at 273. After he was arrested, police drove to the residence he shared with a woman named Debbie Fischer. Id. Officers then spoke with her on the property outside the home, ensuring they "minimize[d] the number of officers on the scene" to avoid overwhelming Fischer. Id. at 273-74. Officers requested Fischer's consent to search the house and property due to their belief that Price was involved in methamphetamine manufacturing, and Fischer verbally consented "without hesitation." Id. at 274. The court of appeals held this consent voluntary, noting "the circumstances of the encounter were low-key," no officers drew their weapons, and "at no point was [Fischer] arrested, handcuffed, or even touched." Id. at 279.

In the matter *sub judice*, the government argues that Detective Monte "had an objectively reasonable basis for believing there was consent for his presence in

the home." (See Doc. 53 at 16).[4] We disagree. As a threshold matter, the voluntariness analysis generally presumes that consent is requested by officers. See Schneckloth, 412 U.S. at 229, 231, 232 (noting consideration of "police *questions*," circumstances surrounding "the initial *request* to search," and whether an officer informed a person of the right to refuse "before *eliciting* his consent" (emphasis added)). Detective Monte never requested consent. Instead, he testified, "Once the arrest warrant was served we were back in the residence. *There was no, you know, do I have consent to enter your residence.*" (See 5/24/21 Tr. 57:20-23) (emphasis added). He simply followed Johns inside, even though he had no reason to do so—Tyler was arrested and gone, and no officer observed "drugs, guns, [or] anything illegal in plain view" during the arrest or sweep. (See id. at 22:6-24, 46:20-47:4).

Detective Monte's police report confirms his testimony, as it notes he simply "walked inside with Johns" after Tyler was arrested and removed from the residence. (See Doc. 38-3 at 8). The affidavit of probable cause is also silent as to any requested or obtained consent, stating in one sentence that "officers made

---

[4] The government appropriately concedes that Tyler had a protectable privacy interest in the 611 Mulberry Street residence. (See 8/24/21 Tr. 33:18-23). Moreover, Johns confirmed that, while Tyler did not stay there frequently, he had a key to the residence and kept personal items there. (See id. at 28:11-29:3). The record indicates his clothing was recovered from a bedroom in the residence. (See Doc. 38-3 at 9; 5/14/21 Tr. 14:7-13). Furthermore, the Marshals' surveillance team witnessed Johns and Tyler entering and exiting the residence multiple times. (See 5/24/21 Tr. 11:17-12:21, 13:6-14:6). Even in the absence of the government's concession, we would readily conclude Tyler had a legitimate expectation of privacy in the 611 Mulberry Street residence as an overnight guest. See Minnesota v. Olson, 495 U.S. 91, 98-99 (1990).

9

entry and subsequently arrested Tyler inside the residence," followed immediately by Detective Monte's averment: "While inside the residence, this officer detected a strong odor of marijuana." (See Doc. 38-4 at 2). Johns also had no recollection of any officer asking her permission to come into the residence, and stated only that officers "just said I could go in." (See 8/24/21 Tr. 20:3-13). Nor did Detective Glatfelter recall Detective Monte asking for Johns' consent; he only recalled that Johns was "brought back in" after Tyler was arrested. (See 5/14/21 Tr. 69:13-23, 71:5-8). Johns' consent was not "freely and voluntarily given," because it was not given at all. See Schneckloth, 412 U.S. at 222.

The government argues that Johns' lack of outright objection when Detective Monte entered implied her consent. (See Doc. 53 at 13-19). To be sure, "the parties' verbal and nonverbal actions" are relevant factors in the voluntariness analysis. See Givan, 320 F.3d at 459. And an outright invitation to officers to step inside certainly indicates voluntary consent. See Stabile, 633 F.3d at 231; Claus, 458 F. App'x at 189. The problem with the government's argument is that it assumes Johns' actions were a response to some sort of request. But Detective Monte never sought Johns' permission to walk inside after her. (See 5/14/21 Tr. 58:9-16 (The Court: ". . . I think you've answered my question, but what you're saying is you did not ask her for consent at any point in time . . ." The Witness: "Correct.")). It strains credulity that Johns' actions when reentering her own residence could be reasonably interpreted as consent for Detective Monte to follow her in, when no request to come inside was ever made. And once he crossed the threshold of the residence, Detective Monte immediately claimed to smell marijuana, read Johns her

Miranda rights, and directed those present to sit and wait while he left to obtain a search warrant. (See Doc. 38-3 at 8; 5/24/21 Tr. 29:22-24, 41:25-42:14). At that point, any attempt by Johns to tell officers to leave would have been futile.

Assuming, *arguendo*, that Johns' actions indicated nonverbal consent, we do not consider that consent voluntary. The setting in which this encounter took place stands in stark contrast to the facts in Price. Cf. Price, 558 F.3d at 279. Detective Monte stated there were "anywhere from fifteen to twenty" officers on scene, many armed with ballistic shields and helmets. (See 5/24/21 Tr. 19:12-22, 59:4-9). Johns credibly testified she saw officers "surrounding" her house and heard them banging on the door with yells for her to come out with her hands up. (See 8/24/21 Tr. 15:7-16:20). As she complied and exited the residence into her yard, a shotgun was pointed directly at her. (See id. at 6:11-7:1, 7:15-8:9, 17:12-18:9). In short, little to nothing about this encounter was "low-key"—it was highly coercive. See Price, 558 F.3d at 279.

Officers also never left Johns' side or indicated to her that she could leave during or after Tyler's arrest. Instead, Detective Monte testified that his assignment "was to stay with Ms. Johns the entire time" of Tyler's arrest. (See 5/14/21 Tr. 20:19-23). Following the arrest and protective sweep, Johns was simply "brought back inside" or "followed" inside, while other officers were still inside the residence. (See id. at 47:1-4, 69:19-25; 8/24/21 Tr. 12:9-13:10). In no way was this atmosphere conducive to a consent request. See Price, 558 F.3d at 279. It is therefore unsurprising that Johns testified she did not feel as though she could have prevented officers from walking into her house, stating "I was afraid they were

11

going to do what they wanted," and "I was afraid that they would not listen to anything that I had to say." (See 8/24/21 Tr 11:3-7, 12:23-13:4).

The remaining factors are a wash. Weighing further against voluntariness, Johns had no previous experience with the criminal justice system. Cf. Price, 558 F.3d at 279; (see also 8/24/21 Tr. 4:17-5:5). Johns was also never advised of a right to refuse Detective Monte's entrance into her residence. See Price, 558 F.3d at 279 (citing Schneckloth, 412 U.S. at 227 (advising of right to refuse consent is one relevant factor)); (see also 5/14/21 Tr. 57:2-58:16; 8/24/21 Tr. 13:5-10). In favor of voluntariness are John's age (43), education (high school), and intelligence (good student). See Price, 558 F.3d at 278; (see also 8/24/21 Tr. 2:12-3:3). Furthermore, no physical punishment was involved and the duration of the encounter, from Johns' exit to Detective Monte's entrance, was relatively brief—less than 15 minutes. Detective Monte believed it took about five minutes after Johns exited for officers to enter the residence and secure Tyler, and another few minutes to conduct a protective sweep. (See 5/14/21 Tr. 19:23-20:13, 21:19-22). Johns also estimated they were outside for about ten minutes. (See 8/24/21 Tr. 19:14-21). We do not consider "the repetition or duration of the questioning," see Price, 558 F.3d at 278, as no questions about consent were ever asked.

Based on the totality of circumstances, we find that the government has failed to prove by a preponderance of the evidence that Johns voluntarily consented to Detective Monte's entrance into her residence. See Morales, 861 F.2d at 399 (citing Matlock, 415 U.S. at 171). Indeed, Johns did not consent at all. Johns' lack of consent renders Detective Monte's entrance into the residence and the resulting

search unreasonable.  See Schneckloth, 412 U.S. at 233.  We find no basis to apply the independent-source doctrine, see Segura v. United States, 468 U.S. 796, 814 (1984), because the government concedes that Detective Monte's detection of marijuana immediately upon entry was the sole basis for probable cause to search the residence, (see Doc. 53 at 12).  Evidence derived from the search of 611 Mulberry Street therefore constitutes "fruit of the poisonous tree," and will be suppressed.  See United States v. Davis, 383 F. App'x 172, 175 (3d Cir. 2010) (nonprecedential) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

## IV.   Conclusion

We will grant Tyler's motion (Doc. 38) to suppress evidence because an illegal search formed the factual basis for the warrant for 611 Mulberry Street.  We will therefore suppress the evidence seized from the residence.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    September 2, 2021